## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

IN RE:       )
          )  Case No. 3:19-bk-00690
DAVID KEVIN SHARP,   )  Chapter 11
          )  Judge Marian F. Harrison
  Debtor.      )

## DISCLOSURE STATEMENT TO ACCOMPANY
## DEBTOR'S PLAN OF REORGANIZATION DATED MARCH 12, 2019

The Debtor, David Kevin Sharp (the "Debtor" or "Mr. Sharp"), submits this Disclosure Statement (the "Disclosure Statement") for use in soliciting acceptance of his Plan of Reorganization (the "Plan") dated March 12, 2019. A copy of the Plan is submitted herewith. The purpose of this Disclosure Statement is to provide adequate information to creditors and parties in interest (hereinafter, "Claimants") in the above Chapter 11 case, in order to enable Claimants to make an informed decision in exercising their rights under the Bankruptcy Code. All capitalized terms not specifically defined herein shall have the definition ascribed to them in the Debtor's Plan of Reorganization, accompanied herewith.

## INTRODUCTION

On February 5, 2019, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Since the filing of the petition, the Debtor has remained in possession of his property and operated his affairs as Debtor-in-Possession. No Trustee has been appointed, nor has a committee of unsecured creditors been appointed.

This Disclosure Statement is intended to contain "adequate information" (as defined in 11 U.S.C. § 1125(a)) of a kind, and in sufficient detail, that would enable a hypothetical investor typical of the holders of Claims or Interests in the case to make an informed judgment in voting to accept or

1

reject the Plan. Approval of this Disclosure Statement by the Court does not constitute a recommendation to accept or reject the Plan.

Article I of the Plan contains definitions of certain terms. Where those terms are capitalized in this Disclosure Statement, they have the meaning set forth in Article I of the Plan.

## DISCLAIMER

No representations concerning the Debtor, other than as set forth in this Disclosure Statement, are authorized by the Debtor. Any representations or inducements made to secure your acceptance that are other than as contained in this Disclosure Statement should not be relied upon by you in arriving at your decision.

The information contained in this Disclosure Statement has been primarily derived from the Debtor. The Debtor believes the information to be correct; however, the information has not been independently verified in every instance, nor has it been subjected to a certified audit.

## TAX CONSEQUENCES

Section 1125(a)(1) of the Bankruptcy Code requires the Debtor to include a discussion of any potential material federal tax consequences of the Plan. Creditors and equity interest holders concerned with how the Plan may affect their tax liability should consult with their accountants, attorneys, or advisors. A tax consequence of the Chapter 11 filing is that the Debtor is entitled to exclude from gross income any cancellation of debt resulting from this Plan. The Debtor is not aware of any potential material federal tax consequences to it or a hypothetical investor.

## THE DEBTOR

### A.    Profile of the Debtor

The Debtor is an individual residing at 3021 St. Johns Drive, Murfreesboro, Rutherford

2

County, Tennessee 37129. He is married to his wife, Annette Sharp, who is not a debtor in this case. The Debtor's primary asset is, and his primary source of income comes from, his operation of his solely owned company, Reel Amusements, LLC ("Reel"). Reel is also a debtor in a chapter 11 bankruptcy case before this Court, Case No. 18-05883 (the "Reel Bankruptcy"). In the Reel Bankruptcy, Reel has filed a disclosure statement and proposed a plan of reorganization, both of which have been amended (the "Reel Disclosure Statement" and the "Reel Plan," respectively). (*See* Case No. 18-5883, Doc. Nos. 98, 99, 136, 137, 182). These filings address Reel's operations, business model, and history that led Reel to file bankruptcy.

This bankruptcy is a necessary consequence of the Reel Bankruptcy. The Debtor is a personal guarantor of much of Reel's debts (the "Guaranteed Reel Debts"). Reel's inability to pay these debts on their contractual terms—the very basis for Reel's bankruptcy filing—has now caused the Debtor to become exposed on these personal guarantees. Upon Reel's filing, the holders of the Guaranteed Reel Debts have begun pursuing the Debtor outside of bankruptcy to collect thereon, including through the filing of four separate lawsuits against the Debtor.

Since filing the Reel Bankruptcy, Reel has taken steps to address these underlying liabilities. Reel has proposed the Reel Disclosure Statement and the Reel Plan to restructure these liabilities on terms that comply with the Bankruptcy Code. The Debtor now submits this Disclosure Statement to address his guarantee liability on the Guaranteed Reel Debts and to address his outstanding liability for certain personal debts unrelated to Reel.

### B. Post-Bankruptcy

Immediately upon the commencement of this case, the Debtor filed a motion for the employment of undersigned counsel as its bankruptcy counsel for this chapter 11 case. The Debtor's

Initial Debtor Interview occurred on February 19, 2019, and the Debtor's Meeting of Creditors occurred on March 6, 2019. The Debtor now submits this Disclosure Statement to his creditors and the Court for approval.

### C.    Assets of the Debtor

A detailed listing of the Debtor's assets and liabilities are contained in its Schedules of Assets and Liabilities (*see* Docket Nos. 15-16). Specifically, the Debtor's primary assets consist of the following:

1.    <u>Real Property</u>. The Debtor does not own any real property alone. All of his real property is owned with his non-filing spouse, Annette Sharp, in tenancy by the entireties. The Debtor's primary residence, which he owns with his wife, is located at 3021 St. Johns Drive, Murfreesboro, Rutherford County, Tennessee 37129 (the "Principal Residence"). The estimated market value of the Principal Residence is $565,000.00. The Debtor also owns a condominium located at 112 Seascape Drive, Unit 410, Miramar Beach, Walton County, Florida 32550 (the "Condominium") with his wife, which has an estimated market value of $425,000.00. Because the Principal Residence and the Condominium are owned with the Debtor's non-filing spouse in tenancy by the entireties, however, the estimated market value of the Debtor's interest in his real property is $0.00.

2.    <u>Vehicles</u>. The Debtor owns a 2016 Cadillac Escalade with approximately 25,000 miles. The estimated market value of this vehicle is $45,000.00. This vehicle is encumbered by a lien in favor of U.S. Bank in the amount of approximately $35,860.86, and any equity remaining therein is subject to the Debtor's exemptions set forth in Schedule C.

4

3.   Miscellaneous Personal Property owned with Non-Filing Spouse.  The Debtor owns certain miscellaneous personal property with his non-filing spouse as set forth in Schedule A/B of his filed Statements and Schedules (Doc. No. 16).  This includes miscellaneous household goods, electronics, and art.  The estimated liquidation value of these assets is approximately $12,500.00, though the Debtor's interest in these assets is worth approximately $0.00 due to their ownership in tenancy by the entireties with the Debtor's non-filing spouse.  Moreover, the Debtor's interest in these assets is subject to the Debtor's exemptions set forth in Schedule C.

4.   Miscellaneous Personal Property owned by Debtor.  In addition to the assets listed above, the Debtor also owns certain miscellaneous personal property separate from his non-filing spouse.  This includes golf clubs, firearms, clothing, watches, and other miscellaneous jewelry.  This also includes the estimated surrender value of two life insurance policies held by the Debtor.  The estimated liquidation value of these assets is approximately $65,500.00.  The Debtor's interest in these assets is subject to the Debtor's exemptions set forth in Schedule C.

5.   Cash.  The Debtor owns an interest in cash, but all of his cash and deposit accounts are owned as tenants by the entireties with his non-filing spouse.  As of the date of filing, the Debtor and his non-filing spouse had approximately $1,000.00 in cash, $12,842.32 in a checking account with Wilson Bank, and $146,631.85 in a savings account with Wilson Bank.  However, the estimated value of the Debtor's interest in this cash is approximately $0.00 due to his ownership of such cash in tenancy by the entireties with his non-filing spouse.  Moreover, the Debtor's interest in these assets is subject to the Debtor's exemptions set forth in Schedule C.

6.   Ownership of Interests in Businesses.  The Debtor owns a 100% interest in Reel Amusements, LLC and a 50% interest in Titan Gaming, LLC, a pass through entity that

5

deposits all of its receivables in Reel. Because these entities are insolvent, and Reel is itself a debtor in chapter 11 with uncertain reorganization prospects, the estimated value of the Debtor's interest in these assets is unknown, but likely not more than $0.00.

7.    Retirement Accounts. The Debtor owns certain exempt retirement accounts. He holds a 401(k) with Mass Mutual of approximately $162,000.00. He also holds a Roth IRA with U.S. Bank of approximately $13,773.00. The Debtor's interest in these assets is subject to the Debtor's exemptions set forth in Schedule C.

8.    Life Insurance Policies. The Debtor holds two term life insurance policies, both of which are maintained by Protective Insurance. The first policy names Annette Sharp as beneficiary, while the second names Pinnacle Bank, as assignee of Annette Sharp, as beneficiary. These policies are subject to cancellation upon the Debtor's failure to fund such policies. The estimated surrender value of these policies is $25,000.00 each, or $50,000.00.

9.    Preferences and Voidable Transfers. The Debtor made payments during the 90-day period (or one-year period for insiders) prior to the filing of this case to Bank of America of $14,195.43. Pinnacle Bank also recorded an involuntary judgment lien against the Residence on January 15, 2019. The Debtor and his wife, as tenants by the entireties, also sold certain real property to an independent third party on May 29, 2018 and transferred certain money held as tenants by the entireties to the Debtor's daughter to help her fund a down payment on her house and the construction of a fence thereon. A portion of these transfers may be recoverable preferences or voidable transfers that would be beneficial to the estate. The Debtor will continue his analysis of these transfers, and other potential preferences and voidable transfers. The Debtor specifically reserves the right to pursue these actions.

6

10.  Reservation of Causes of Action / Authority to Pursue and Settle

**The Plan retains and reserves all causes of action, including avoidance actions, for pursuit or abandonment by the Debtor after Confirmation, within his sole discretion.**

As noted above, the Plan retains and reserves for pursuit by the Debtor all avoidance actions arising under Chapter 5 of the Bankruptcy Code. The terms of the Plan give the Debtor the widest possible latitude in deciding whether or not to pursue any possible cause of action, including without limitation any preference pursuant to Section 547, voidable transfer claims pursuant to Section 548, or any other avoidance action.

All creditors identified in the Debtor's Statement of Financial Affairs filed in this case as having received payments from the Debtor in the 90 days (or one year if an insider) preceding the Petition Date, may be the defendant of an avoidance action or other cause of action if the total payments to them exceeds $6,425.00. Thus, they are the potential defendants of an avoidance action pursuant to Section 547 of the Bankruptcy Code.

The persons or entities identified in the Debtor's Statement of Financial Affairs filed in this case as having received transfers outside the ordinary course of business or financial affairs of the Debtor within two years of the commencement of this Bankruptcy Case may be the defendant in an avoidance action or other cause of action. Thus, they are the potential defendants in an avoidance action pursuant to Section 548 of the Bankruptcy Code.

The identified claims in the Statement of Financial Affairs are not intended to be a complete list, and the Debtor may add or amend the identified claims after Confirmation. The Plan reserves and retains any and all other causes of action regardless of whether they are specifically identified or referred to herein. Nothing contained in this Disclosure Statement or in the Plan shall have any

7

preclusive effect against the Debtor (whether by waiver, admission, estoppel, or otherwise) in any cause of action or proceeding that may exist or occur in the future. Each creditor and party in interest is advised to review the Plan, the Debtor's filed Schedules and Statement of Financial Affairs, and the creditor's prior dealings with the Debtor, to determine whether any cause of action or avoidance action may be pursued against it.

## DEBTOR'S LIABILITIES

### A. Post-Petition Administrative Expense Claims

Administrative expense claims include the actual, necessary costs and expenses associated with preserving the Debtor's bankruptcy estate. These claims are more fully set forth in 11 U.S.C. § 503 and are accorded priority under 11 U.S.C. § 507. The administrative claims in this case are as follows:

     1.    United States Trustee Quarterly Fees. The Debtor is current, and will remain current, with payments to the United States Trustee through the entry of a final decree closing the bankruptcy case.

     2.    Payments to Professionals. The Debtor shall remain current with payments to any and all professionals employed during this bankruptcy case. As of the filing of the Plan, the Debtor has not employed any professionals, but he has filed a motion for the employment of the undersigned counsel as counsel for the Debtor pursuant to 11 U.S.C. § 327.

### B. Secured Claims

*IN THE EVENT ANY OF THE CLAIMANTS LISTED IN THIS SECTION C FILE A PROOF OF CLAIM STATING THAT NO PART OF THE CLAIM IS SECURED, OR UPON AN OBJECTION TO A SECURED CLAIM WHEREIN AN ORDER OF THE COURT DETERMINES A CLAIM TO BE UNSECURED, THEN SUCH CLAIM SHALL BE DEEMED ENTIRELY UNSECURED AND TREATED AS SUCH PURSUANT TO THE PLAN*

8

a.     Bank of America.  Bank of America ("BOA") holds a Secured Claim in the amount of $136,508.38, plus allowable post-petition fees and expenses, secured by a first priority lien on the Condominium.  The claim of BOA arises from a promissory note and mortgage (the "Condominium Mortgage") in favor of Countrywide Bank, FSB, recorded with the Walton County Clerk of Court (the "Clerk's Office") on March 26, 2008 in Book 2788, Page 2756.  The Condominium Mortgage was assigned to BOA pursuant to an Assignment of Mortgage recorded with the Clerk's Office on February 15, 2019 in Book 3097, Page 2376.  The Debtor intends to pay BOA in full pursuant to the Plan and further has no intention of impairing the collateral securing repayment of the obligations to BOA.

b.     Pinnacle Bank.  Pinnacle Bank holds two claims that are secured against the Residence.  Its first claim is a first priority secured claim in the amount of $142,001.93 (the "First Pinnacle Claim").   The Debtor's obligation to Pinnacle Bank on the First Pinnacle Secured Claim arises from a promissory note and open ended deed of trust (the "First Pinnacle DOT") dated on or around August 21, 2006 in the original principal amount of $300,000.00 and recorded with the Rutherford County Register of Deeds (the "Register's Office") on August 25, 2006 in Book 658, Pages 1794-1801 and subsequently modified by that certain Modification of Deed of Trust dated September 15, 2009 and recorded with the Register's Office on September 15, 2009 in Book 947, Pages 2421-43.  Its second claim is claim in the amount of $1,041,621.84, which is secured upon the Residence pursuant to the Abstract of Judgment recorded with the Register's Office on January 15, 2019 in Book 1741, Pages 1920-22, less the amount owed on the First Pinnacle Claim (the "Second Pinnacle Claim," and collectively with the First Pinnacle Claim, the "Pinnacle Claims").   The Pinnacle Claims are also secured by one of the Debtor's life insurance policies that is pledged to

9

Pinnacle Bank. The Debtor intends to satisfy the First Pinnacle Claim by paying the same in full in accordance with the terms of the Plan. The Debtor intends to treat the Second Pinnacle Claim as unsecured under the Plan, as this claim became secured through an avoidable preferential transfer. The Debtor shall separately classify the Second Pinnacle Claim in the manner set forth below due to its unique characteristics that distinguish it from the Debtor's other unsecured claims. The Debtor proposes to satisfy the Second Pinnacle Claim as set forth in the Plan and described below.

    c. <u>Fifth Third Bank.</u> Fifth Third Bank ("FTB") holds a secured claim in the amount of $78,459.38 as of the Petition Date (the "FTB Claim"), secured by a second position lien on the Residence. The Debtor's obligation to FTB arises from a promissory note dated February 23, 2015 in the original principal amount of $338,750.00 and secured by an open-ended deed of trust recorded with the Register's Office on and recorded with the Register's Office on April 23, 2015 in Book 1369, Pages 2593-2619 (the "FTB DOT"). The Debtor intends to satisfy the FTB Claim by paying the same in full in accordance with the terms of the Plan and described below. Notwithstanding the foregoing, a portion of the FTB Claim is being satisfied by Reel in Reel's Plan. FTB shall in no event receive more than the total amount of the FTB Claim from all combined sources, including but not limited to the Debtor and Reel.

    d. <u>U.S. Bank</u>. U.S. Bank ("USB") holds a secured claim in the amount of $35,860.86 as of the Petition Date (the "USB Claim"), secured by a lien on the Debtor's 2016 Cadillac Escalade (the "Vehicle"). The USB Claim arises from a purchase money loan taken by the Debtor for the Debtor's purchase of the Vehicle and is secured on the Vehicle pursuant to a security agreement with USB and a notation of USB on the Vehicle's certificate of title. The Debtor intends to pay the USB Claim in full on the terms set forth in the Plan and described below.

10

e.     <u>Mass Mutual</u>.   Mass Mutual holds a secured claim in the amount of $15,163.82 as of the Petition Date (the "Mass Mutual Claim"), secured by setoff rights against the Debtor's 401(k) maintained therewith.  The Mass Mutual Claim arises from a loan taken by the Debtor against the balance of his 401(k) maintained with Mass Mutual.  The Debtor intends to pay the Mass Mutual Claim in full on the terms set forth in the Plan and described below.

### C.     Unsecured Claims of Seacoast National Bank and NBKC Bank.

Much of the Debtor's debt arises from personal guarantees executed for the benefit of Reel, his solely owned company (the "Guarantee Liability").  Certain of the Guarantee Liability, however, has unique characteristics that require separate classification under the Plan.  This includes the unsecured claims of Seacoast National Bank, which has an unsecured claim for $142,029.26 against the Debtor, and NBKC Bank, which has an unsecured claim for $142,029.26 against the Debtor.  These claims were originated by Credibility Capital and are hereinafter collectively referred to as the "Credibility Claim," with the creditors collectively referred to as the "Credibility Creditors").  The Credibility Creditors are unique in that they have expressed an intent to seek non-dischargeability of the Credibility Claim against the Debtor.  The Debtor disputes that the Credibility Claim is non-dischargeable, and he is prepared to defend against it, but the cost of such defense could exceed $10,000.00 and therefore not be in the interest of the estate, the other creditors, or the Debtor's reorganization.  Instead, the Debtor proposes that the Credibility Claim shall be deemed fully satisfied upon the Debtor's payment the amounts set forth in the Plan and described below.

### D.     The Second Pinnacle Claim

As set forth in Section C(b) above, the Second Pinnacle Claim is the claim of Pinnacle Bank for $1,041,621.84, less the amount owed on the First Pinnacle Claim set forth above.  The Second

11

Pinnacle Claim arises from the judgment lien described in Section C(b) above, which will be deemed an avoidable transfer and therefore treated as wholly unsecured against the Debtor. The Second Pinnacle Claim is classified separately from the remaining unsecured claims due to its unique characteristics. Specifically, unlike the Debtor's other unsecured debts, the Second Pinnacle Claim is collectible against the Debtor and his non-filing spouse, whereas the remaining unsecured debts of the Debtor are collectible against the Debtor alone. Because nearly all of the Debtor's material, non-exempt assets are owned with his non-filing spouse in tenancy by the entireties, the assets from which Pinnacle Bank may recover on the Second Pinnacle Claim in a chapter 7 liquidation or under state law differs materially from the assets available to all other unsecured creditors. The Debtor proposes to treat the Second Pinnacle Claim in the amount and on the terms set forth in the Plan and described below.

### E.  Guaranteed Unsecured Claims

Much of the Debtor's debt constitutes Guarantee Liability, as defined above. Some of the Guarantee Liability is secured on certain of the Debtor's assets, while the remainder that is not separately classified in the Debtor's Plan is unsecured (the "Guaranteed Unsecured Claims"). The total amount of the Guaranteed Unsecured Claims is $723,642.47. A detailed listing of the Guaranteed Unsecured Claims is attached hereto as Exhibit A. Exhibit A contains the amount in which such Guaranteed Unsecured Claims are proposed to be deemed as allowed unsecured claims. If an asserted claim to which Reel is also liable is not contained on this list, or if a claimant believes the amount is inaccurate, the Plan shall be considered either to object to the allowance of, or the amount of, the claim. The hearing on any objection to this allowance or disallowance shall be consolidated with the hearing on confirmation of the Plan.

12

Reel has scheduled all of the Guaranteed Unsecured Claims as unsecured claims in its plan of reorganization filed in the Reel Bankruptcy, which are to be paid in the manner set forth therein. The Debtor intends to treat the Guaranteed Unsecured Claims in his plan by renewing his personal guarantee of the Guaranteed Unsecured Claims, but only in the amount to be paid thereto by Reel in Reel's plan of reorganization. Thus, in the event Reel does not pay its unsecured creditors in accordance with its plan of reorganization, the Debtor shall remain personally liable for all amounts that Reel has proposed to pay such creditors therein. The remaining amounts of the Guaranteed Unsecured Claims shall be paid *pro-rata* with the Non-Guaranteed Unsecured Claims (defined below) based on the amount to be distributed thereto under the Plan and as described below.

F.    **Non-Guaranteed Unsecured Claims**

The Debtor's unsecured debt that is not treated as Unsecured Guarantee Liability, as reflected in the Debtor's Schedules, is shown below (the "Non-Guaranteed Unsecured Claims"). The total amount of the Non-Guaranteed Unsecured Claims is $4,296.17. A detailed listing of the Non-Guaranteed Unsecured Claims is attached hereto as Exhibit A. Exhibit A contains the amount in which such Non-Guaranteed Unsecured Claims are proposed to be deemed as allowed unsecured claims. If an asserted claim is not contained on this list, or if a claimant believe the amount is inaccurate, the Plan shall be considered either to object to the allowance of, or the amount of, the claim. The hearing on any objection to this allowance or disallowance shall be consolidated with the hearing on confirmation of the Plan. The Debtor intends to treat the Non-Guaranteed Unsecured Claims by paying them *pro-rata* with the Guaranteed Unsecured Claims based on the amount to be distributed thereto as set forth in the Plan and explained below.

13

## SUMMARY OF THE PLAN

### A. Classification of Claims and Interests

The Claims of creditors and Interests of equity security holders under the Plan are divided into the following classes:

Class 1    *Administrative Claims*

Class 2    *Secured Claim of Bank of America*

Class 3    *Secured Claim of Pinnacle Bank (the "First Pinnacle Claim")*

Class 4    *Secured Claim of Fifth Third Bank*

Class 5    *Secured Claim of U.S. Bank*

Class 6    *Secured Claim of Mass Mutual*

Class 7    *Unsecured Claims of Seacoast National Bank and NBKC Bank (the "Credibility Claim")*

Class 8    *Unsecured Claim of Pinnacle Bank (the "Second Pinnacle Claim")*

Class 9    *Guaranteed Unsecured Claims*

Class 10   *Non-Guaranteed Unsecured Claims*

Class 11   *Ownership Interests*

### B.    Treatment of Claims

Class 1 and Class 11 are unimpaired as determined pursuant to 11 U.S.C. § 1124. All other classes are impaired. The following is a summary of the treatment provided in the Plan to each Class of Claims and Interests:

1.    <u>Class 1:  Administrative Expense Claims</u>.    Class 1 consists of Administrative Expense Claims that are deemed Allowed pursuant to 11 U.S.C. §§ 503 and 507(a)(2). Except for quarterly fees owed to the United States Trustee, which will be paid when due, the holders of Class 1

14

Allowed Claims shall be fully paid within 10 business days of the later of: (i) the entry and finality of an order of the Court allowing such claim or (ii) the Effective Date of the Plan. The Debtor shall continue to make post-confirmation quarterly fee payments to the United States Trustee until entry of a Final Decree pursuant to 11 U.S.C. § 350. Any administrative claims representing a liability incurred in the ordinary course of the Debtors' business may be paid in cash after the Confirmation Date.

2. <u>Class 2: Bank of America</u>. Class 2 consists of the secured claim of BOA. The Class 2 Claim shall be Allowed in the amount of $136,508.38. The Class 2 Claim shall be paid in full, with interest at four percent (4%) per annum in one hundred eighty (180) equal monthly installments beginning on the first day of the month that is six (6) months following the Effective Date of the Plan and continuing on the first day of each successive month until paid in full. With respect to the Class 2 Claim, this results in regular monthly payments of $1,009.74. BOA shall retain its lien on the Condominium under this Plan in the same manner and priority as existed on the Petition Date pending full payment of the Class 2 Claim as set forth herein. The Debtor shall also retain all required insurance on the collateral securing the Class 2 Claim. Any terms of the existing note and security agreement evidencing the Class 2 Claim which may conflict with the terms of the Plan shall be deemed modified by the terms of the Plan.

3. <u>Class 3: The First Pinnacle Claim</u>. Class 3 consists of the First Pinnacle Claim, as defined above. The Class 3 Claim shall be allowed in the amount of $142,001.93. The Class 3 claim shall be paid in full, with interest at five point seven five percent (5.75%) per annum in one hundred twenty (120) equal monthly installments beginning on the first day of the month that is six (6) months following the Effective Date of the Plan and continuing on the first day of each

successive month until paid in full. With respect to the Class 3 Claim, this results in regular monthly payments of $1,558.74. Pinnacle Bank shall retain its lien on the Residence under this Plan in the same manner and priority as existed on the Petition Date pending full payment of the Class 3 claim as set forth herein. The Debtor shall also retain all required insurance on the collateral securing the Class 3 Claim. The Debtor shall also retain his pledge of his life insurance policy currently pledged to Pinnacle Bank as additional security for the First Pinnacle Claim pending payment thereof in accordance with the Plan. Any terms of the existing note and security agreement evidencing the Class 3 Claim which may conflict with the terms of the Plan shall be deemed modified by the terms of the Plan. The Debtor acknowledges, however, that in the event of a default of his obligations under the Plan, or a default of Reel's obligations under the Reel Plan, Pinnacle shall be entitled to recover any and all amounts owed to Pinnacle under applicable state law, subject to the provisions in such Plans governing default, notice thereof, and opportunity to cure.

     4.    <u>Class 4: Fifth Third Bank</u>. Class 4 consists of the secured claim of Fifth Third Bank. The Class 4 Claim shall be Allowed in the amount of $78,459.38. The Class 4 Claim shall be paid in full, with interest at a rate of five point seven five percent (5.75%) per annum in sixty (60) equal monthly installments beginning on the first day of the month that is six (6) months following the Effective Date of the Plan and continuing on the first day of each successive month until paid in full. With respect to the Class 4 Claim, this results in regular monthly payments of $1,507.74. The Class 4 Claim shall be secured by a lien on the Residence under this Plan in the same manner and priority as existed on the Petition Date pending full payment of the Class 4 Claim as set forth herein. The Debtor shall also retain all required insurance on the collateral securing the Class 4 Claim. Notwithstanding the foregoing, a portion of the Class 4 Claim is being satisfied by Reel in Reel's

16

Plan. The Class 4 Claimant shall in no event receive more than the total amount of the Class 4 Claim from all combined sources, including but not limited to the Debtor and Reel. Any terms of the existing note and security agreement evidencing the Class 4 Claim which may conflict with the terms of the Plan shall be deemed modified by the terms of the Plan.

5.    <u>Class 5: U.S. Bank.</u>  Class 5 consists of the secured claim of U.S. Bank. The Class 5 Claim shall be Allowed in the amount of $35,860.86. The Class 5 Claim shall be paid in full, with interest at a rate of four percent (4%) per annum in sixty (60) equal monthly installments beginning on the first day of the first month following the Effective Date of the Plan and continuing on the first day of each successive month until paid in full. With respect to the Class 5 Claim, this results in regular monthly payments of $660.43. U.S. Bank shall retain its lien on the Vehicle to secure payment of the Class 5 Claim pending full payment thereof. The Debtor shall also retain all required insurance on the collateral securing the Class 5 Claim. Any terms of the existing note and security agreement evidencing the Class 5 Claim which may conflict with the terms of the Plan shall be deemed modified by the terms of the Plan.

6.    <u>Class 6: Mass Mutual.</u>  Class 6 consists of the secured claim of Mass Mutual. The Class 6 Claim shall be allowed in the amount of $15,163.82  The Class 6 Claim shall be paid in the same manner and on the same terms as provided in the Debtor's loan agreement with Mass Mutual executed prepetition. With respect to the Class 6 Claim, this results in regular weekly payments of $214.21 beginning on the first day of the first month that is six (6) months following the Effective Date and continuing each week until the Class 6 Claim is paid in full. Mass Mutual shall retain its offset rights against the Debtor's 401(k) plan to secure payment of the Class 6 Claim in the same manner and priority as existed prepetition pending full payment thereof. Any terms of the existing

17

note and security agreement evidencing the Class 6 Claim which may conflict with the terms of the Plan shall be deemed modified by the terms of the Plan.

7.    <u>Class 7: Unsecured Claims of Seacoast National Bank and NBKC Bank (the "Credibility Claim")</u>.  Class 7 consists of the unsecured claims of Seacoast National Bank and NBKC Bank, which are collectively defined as the "Credibility Claim" above.  The Credibility Claim arises from certain debt of Reel that the Debtor personally guaranteed.  As set forth above, the Credibility Claim is unique from the other unsecured claims in this case because the Credibility Creditor has asserted that the Credibility Claim should be deemed non-dischargeable.  The Debtor disputes that the Credibility Claim is non-dischargeable, but the cost to defend these claims would exceed the value of the treatment proposed herein and would also prejudice the estate, the other creditors, and the Debtor, which merits separate classification of the Credibility Claim.

The claim of Seacoast National Bank shall be Allowed in the amount of $142,029.26.  The claim of NBKC Bank shall also be Allowed in the amount of $142,029.26, for a total of $284,058.52.  The Credibility Claim shall be paid as follows

(i)    The first $65,000.00 of the Credibility Claim shall be paid by Reel pursuant to the plan of reorganization proposed in the Reel Bankruptcy, since Reel is the primary creditor thereon.  The Debtor shall have no obligation to pay any portion of the Credibility Claim already provided for in the Reel Bankruptcy.

(ii)    The remaining $219,058.52 of the Credibility Claim shall be deemed fully satisfied upon the Debtor's payment of $5,000.00 to each of Seacoast National Bank and NBKC Bank on the Effective Date of the Plan.

18

8.    <u>Class 8: the Unsecured Claim of Pinnacle Bank (the "Second Pinnacle Claim")</u>. Class 8 consists of the unsecured portion of the claim of Pinnacle Bank after payment of the First Pinnacle Claim, defined above as the Second Pinnacle Claim. While Pinnacle Bank has obtained a judgment lien against the Debtor's assets, such judgment lien is an avoidable preferential transfer, as it was obtained within the ninety (90) days before the Petition Date, so it is hereinafter treated as an unsecured claim. The Second Pinnacle Claim is Allowed in the amount of the full amount of the Pinnacle Claim, less the amount to be paid thereto on the First Pinnacle Claim. The Second Pinnacle Claim arises from certain debt of Reel that the Debtor personally guaranteed. While treated as unsecured, the Second Pinnacle Claim is unique from the remaining Guaranteed Unsecured Claims in this case because the Debtor's non-filing spouse is also personally liable as a guarantor on the Second Pinnacle Claim, whereas the remaining Guaranteed Unsecured Claims are owed by the Debtor alone. Because nearly all of the Debtor's material, non-exempt assets are owned with his non-filing spouse in tenancy by the entireties, the assets from which Pinnacle Bank may recover on the Second Pinnacle Claim in a chapter 7 liquidation or under state law differs materially from the assets available to all other unsecured creditors. The Debtor proposes to treat the Second Pinnacle Claim as follows:

a.    The first $475,000.00 of the Second Pinnacle Claim shall be paid by Reel as a secured creditor on the schedule set forth in Reel's plan of reorganization filed in the Reel Bankruptcy (the "Reel Secured Pinnacle Payment"). The Debtor shall have no direct liability on the Reel Secured Pinnacle Payment provided that Reel is not in default on its plan obligations. The Debtor shall agree to retain its personal guarantee on the Reel Secured Pinnacle Payment,

19

but only up to the amount thereof. Pinnacle Bank shall not be entitled to recover any portion of the Reel Secured Pinnacle Payment from the Debtor unless Reel has first defaulted on its Plan and not cured any such default within the terms and manner provided for in Reel's plan of reorganization.

b.    A portion of the Second Pinnacle Claim shall also be paid by Reel as an unsecured creditor via a pro-rata distribution on the schedule set forth in Reel's plan of reorganization filed in the Reel Bankruptcy (the "Reel Unsecured Pinnacle Payment"). The Debtor shall have no direct liability on the Reel Unsecured Pinnacle Payment provided that Reel is not in default on its plan obligations. The Debtor shall agree to retain its personal guarantee on the Reel Unsecured Pinnacle Payment, but only up to the amount thereof. Pinnacle Bank shall not be entitled to recover any portion of the Reel Unsecured Pinnacle Payment from the Debtor unless Reel has first defaulted on its Plan and not cured any such default within the terms and manner provided for in Reel's plan of reorganization.

c.    The remaining balance of the Second Pinnacle Claim shall be deemed satisfied in full upon the Debtor's payment of $75,000.00, which shall be paid interest only at four percent (4%) interest per annum beginning on the first day of the first month that is six (6) months following the Effective Date and continuing on the first of each month thereafter until the earlier of (a) the sale of the Condominium, or (b) five years from the first day of the first month following the Effective Date, at which point the entire $75,000.00

20

shall become due and owing. Upon payment thereof, all of the Debtor's obligations to Pinnacle Bank shall be deemed satisfied, other than the Debtor's continuing contingent guarantees of the Reel Secured Pinnacle Payment and the Reel Unsecured Pinnacle Payment. To avoid any uncertainty, the Debtor affirms that in the event of any default of this Plan or the Reel Plan, subject to the default provisions therein regarding notice and opportunity to cure, Pinnacle Bank shall be entitled to pursue the full amount of the Pinnacle Claim against the Debtor and exercise such remedies as may exist under applicable law to collect such amounts.

    d.    The Debtor shall retain his pledge of his life insurance policy currently pledged to Pinnacle Bank as additional security for the Second Pinnacle Claim pending payment thereof in accordance with the Plan.

2.1    <u>Class 9: the Guaranteed Unsecured Claims</u>. Class 9 consists of the unsecured claims owed by the Debtor as a result of the Debtor's personal guarantee of certain debts owed by Reel and not otherwise classified above. The Guaranteed Unsecured Claims are hereby Allowed in the amount of $723,642.47, a detailed listing of which are set forth in Exhibit A. Exhibit A contains the amount in which such Guaranteed Unsecured Claims are proposed to be deemed as allowed unsecured claims.

Reel has already provided treatment for the Guaranteed Unsecured Claims in its plan of reorganization. The Debtor shall satisfy its obligations on the Class 9 Claims by renewing and affirming his personal guarantee thereon, but only in the amount to be paid thereon by Reel in Reel's plan of reorganization. The renewed guarantee provided herein shall be expressly conditional upon a

21

default by Reel on its plan of reorganization. Specifically, the Debtor shall have no obligation to pay any portion of the Class 9 Claims to be paid by Reel unless Reel has first defaulted on its Plan and not cured any such default within the terms and manner provided for in Reel's plan of reorganization, at which point the holders of the Class 9 Claims shall be entitled to recover these amounts from the Debtor, but only in the amount to be paid thereto in Reel's plan of reorganization. The remaining amount of the Class 9 Claims shall be paid *pro-rata* with the Class 10 Claims from a payment of $10,000.00 to be paid with zero percent (0%) interest in one hundred twenty (120) monthly installments beginning on the first day of the first month that is six (6) months following the Effective Date and continuing each month thereafter until paid in full. This results in monthly payments of $83.33 to the Guaranteed and Non-Guaranteed Unsecured Claims.

9. Class 10: the Non-Guaranteed Unsecured Claims. Class 10 consists of the unsecured claims owed by the Debtor in his individual capacity and not arising from any personal guarantee signed on behalf of Reel, which are defined above as the "Non-Guaranteed Unsecured Claims." The total amount of the Non-Guaranteed Unsecured Claims are set forth in Exhibit A and shall be deemed allowed in the amount of $4,296.17. The Class 10 Claims shall be paid *pro-rata* with the Class 9 Claims from a payment of $10,000.00 to be paid with zero percent (0%) interest in one hundred twenty (120) monthly installments beginning on the first day of the first month that is six (6) months following the Effective Date and continuing each month thereafter until paid in full. This results in monthly payments of $83.33 to the Guaranteed and Non-Guaranteed Unsecured Claims.

10. Class 11: Ownership Interests in the Debtor. David K. Sharp, the individual Debtor, holds the ownership interests in the Debtor's equity. Under the Plan, the Debtor shall retain all ownership interest in all property of the estate, subject to the terms of the Plan.

22

## SUMMARY OF OTHER PROVISIONS OF THE PLAN

Executory Contracts and Unexpired Leases. The only executory contract of which the Debtor is aware is an executory contract between Xtra Lease and Reel, of which the Debtor personally guaranteed Reel's performance. Reel has proposed to assume this contract in its Plan of Reorganization. The Debtor intends to assume all of his obligations under the personal guarantee thereunder. The Debtor is not aware of any other leases or executory contracts that it anticipates assuming or rejecting upon Confirmation. To the extent there are any executory contracts of the Debtor not specifically assumed hereunder, the Debtor hereby specifically rejects those contracts retroactively to the Petition Date.

Prepayment Right. The Debtor shall be entitled to pre-pay any claim or classes of claims under the Plan without penalty at any time. Upon such prepayment in full, the Debtor shall have no further obligation to pay any such claim or classes of claim. Following any prepayment in full of any Claim or Class of Claims as set forth in the Plan, upon request of the Debtor, such claimant shall furnish the Debtor with written confirmation of satisfaction of his obligations under the Plan.

Discharge. Pursuant to 11 U.S.C. § 1141(d)(5), unless the Court orders otherwise, the Debtor shall receive a discharge of all debts, liabilities, and obligations that arose before the Petition Date upon the Debtor's full performance of his obligations under the Plan.

Legally Binding Effect. Confirmation of the Plan will bind the Debtor and all creditors and interest holders, whether or not they accept the Plan. The distributions of consideration provided for in the Plan will be in exchange for and in complete settlement and satisfaction of all Claims and Interests, including any Claim for interest after the Petition Date. On the Confirmation Date, all creditors shall be precluded from asserting any Claim against the Debtor or its property based upon

23

any transaction or other activity of any kind that occurred prior to the Confirmation Date.

Plan Default. Notwithstanding the provisions of any lease or finance agreement that may survive Confirmation of the Plan, an event of default as to any Claim shall exist only if the Debtor (i) fails to make monetary payment when due and that default is not cured within twenty (20) days following delivery of written notice of that default, (ii) fails to insure any property securing any Allowed Secured Claim of any creditor for the value of such property, or (iii) disposes of the property securing any Allowed Secured Claim of any creditor without either the consent of the creditor holding such Allowed Secured Claim or the payment of the net sale proceeds to that creditor.

Modification of the Plan. The Debtor may propose amendments to or modifications of the Plan at any time prior to the Confirmation Date provided that the amended Plan satisfies the requirements of the Code. If the circumstances warrant, after the Confirmation Date and before Substantial Consummation of the Plan, the Debtor may modify the Plan, provided that the Plan, as modified, meets the requirements of the Code, and the Court, after a hearing, confirms the Plan as modified. Unless, within the time fixed by the Court, a creditor changes its previous acceptance or rejection of the Plan, such previous election shall be deemed applicable to the amended Plan.

Plan Injunction. Except as otherwise expressly provided in, or permitted under, this Plan, the Confirmation Order shall provide, among other things, that all Creditors and persons who have held, hold or may hold Claims that existed prior to the Effective Date, are permanently enjoined on and after the Effective Date against the: (i) commencement or continuation of any judicial, administrative, or other action or proceeding against the Debtor or any of its owned entities on account of Claims against the Debtor, or on account of claims released pursuant to the Plan; (ii)

24

enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order against the Debtor or any assets or property of same; or (iii) creation, perfection or enforcement of any encumbrance of any kind against the Debtor arising from a Claim. This provision does not enjoin the prosecution of any claims that arise on or after the Effective Date nor does it enjoin the determination in the Bankruptcy Court of the Allowed Amount of any Claims that arose prior to the Effective Date. Parties asserting entitlement to payment of Administrative Expenses incurred Prior to the Confirmation Date and Holders of Claims shall be permanently enjoined from asserting any Claim against the Debtor or its retained assets based upon any act or omission, transaction or other activity that occurred prior to the Confirmation Date, except as otherwise provided in the Plan, whether or not a proof of claim or interest was filed and whether or not such Claim or Interest is allowed under Section 502 of the Bankruptcy Code.

Post-Confirmation Jurisdiction. The Court shall retain exclusive jurisdiction over this Chapter 11 case for the purpose of determining any matters pertaining to the Plan or the Confirmation Order, as well as determining all disputes, suits or controversies arising out of the Plan and its interpretation, enforcement or consummation. Persons reading this Disclosure Statement should refer to the Plan for a more detailed discussion of the Court's continuing jurisdiction over the Debtor and this case.

Post-Confirmation Reporting. Pursuant to Local Rules of Court, the reorganized Debtor shall file with the Court, within 30 days following the Effective Date of the Plan, a report of the action taken and progress made toward Plan consummation. The Debtor shall also file such a report by March 15 and September 15 of each year of the Plan until the case is closed. These reports will be on file with the Clerk of the Bankruptcy Court, Customs House, 701 Broadway, Nashville,

Tennessee 37203.

## CONFIRMATION REQUIREMENTS

To confirm the Plan, the Court must, after notice, hold a hearing on the issue of confirmation. Any creditor may object to confirmation of the Plan and appear at the confirmation hearing to prosecute such objection. The requirements for confirmation of a Chapter 11 Plan are set forth in detail in 11 U.S.C. § 1129. The following is a summary of the more notable requirements.

<u>Feasibility</u>. Pursuant to 11 U.S.C. § 1129(a)(11), the Court is required to find that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor. There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses which are entitled to be paid on such date. The Debtor asserts that this aspect of feasibility is satisfied because the Debtor shall make available the necessary cash from accounts owned with his non-filing spouse in tenancy by the entireties sufficient to satisfy any Effective Date payments.

The second aspect of feasibility concerns whether the Debtor will have enough cash over the life of the Plan to make the required Plan payments. The Debtor refers any interested party to Exhibit B to this Disclosure Statement, which demonstrates the Debtor's ability to satisfy his obligations under the Plan when coupled with the availability of cash and cash proceeds held with the Debtor's non-filing spouse in tenancy by the entireties. YOU ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL ADVISOR IF YOU HAVE ANY QUESTIONS PERTAINING TO THESE FINANCIAL STATEMENTS.

The Plan proposes to pay the claims of Classes 1-11 in the manner provided in this

Disclosure Statement. As the Debtor's budget in Exhibit B demonstrates, the Debtor's ability to make its required payments under this Plan are feasible. Additionally, the Debtor intends to make available certain amounts from the Debtor's bank accounts held in tenancy by the entireties with his non-filing spouse, and certain proceeds from the sale of the Condominium—which shall be held in tenancy by the entireties with the Debtor's non-filing spouse—to help augment the required monthly payments in months where the Debtor faces unexpected income or expense shocks. The Debtor already has a contract for the sale of the Condominium, and upon the closing thereof, the Debtor will have the available funds necessary to render the Plan feasible. The Plan has been proposed in good faith and in amounts that will allow the Debtor to successfully complete the Plan based on anticipated income, expenses, and available cash.

Absolute Priority Rule. The Absolute Priority Rule provides that a plan is fair and equitable with respect to a rejecting class if the rejecting class receives payment in full or as long as no class junior to it receives or retains property under the Plan. Upon submission to the Court, the Plan satisfies the absolute priority rule because the Debtor believes that any unsecured creditor not receiving payment in full will consent to such treatment based on the disproportionate recovery that would be realized through a liquidation due to the Debtor's nominal current monthly income and the ownership of any equity in property of the estate being held in tenancy by the entireties with the Debtor's non-filing spouse.

Liquidation Analysis. Pursuant to 1129(a)(7), the Debtor must show that each holder of an impaired Claim or Interest has accepted the Plan, or that each holder will receive or retain under the Plan on account of the holder's Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtor's

27

assets were liquidated under Chapter 7 of the Code on said date.

The starting point in determining the amount which creditors of each class of unsecured claims and interest would receive in a Chapter 7 case under Bankruptcy Code, is to estimate the dollar amount that would be generated from the forced liquidation of the Debtor (the "Liquidation Proceeds").

The Liquidation Proceeds of the Debtor would consist of the proceeds from the sale of all of the interests of the Debtor in property, plus cash held by the Debtor and recoveries on any actions against other parties. The Liquidation Proceeds would first be used to pay allowed secured claims, then be reduced by the cost of the liquidation. Costs of liquidation of the Debtor would likely include the fees of the Chapter 7 Trustee, as well as those of counsel and other professionals that would be retained by the Trustee, actual selling expenses, any unpaid expenses incurred by the Debtor during its reorganization under this Chapter 11 (such as fees for attorneys and accountants), and any claims arising by reason of the Trustee's rejection of any contractual or lease obligations of the Debtor. These claims, and such other claims which are likely to arise during the liquidation process under Chapter 7, will result in a diminution of the Liquidation Proceeds available to pay unsecured creditors. The Debtor asserts that the present value of the distributions which could be anticipated from the net Liquidation Proceeds should be compared with the present value offered to each of the classes of unsecured claims and interests under the Plan.

The Debtor's Plan proposes to provide secured creditors 100% of the value of their secured claim, and unsecured creditors an amount in excess of what such unsecured creditors would realize in a Chapter 7 liquidation. Specifically, the Debtor asserts that unsecured creditors would receive not more than $3,668.01 in a liquidation. All of the Debtor's material non-exempt assets are either

28

fully secured with liens in favor of the Debtor's secured creditors or owned with the Debtor's non-filing spouse in tenancy by the entireties. When factoring in the costs of liquidation, a liquidation would yield no money for the unsecured creditors. This is demonstrated through an analysis of the Debtor's assets and liabilities:

**Current Assets**

| | |
|---|---|
| Real Property (owned in tenancy by the entireties with non-filing spouse) | $0.00 (value of Debtor's survivorship interest of TBE property) |
| 2016 Cadillac Escalade | $45,000.00 |
| Cash and Deposit Accounts (owned in tenancy by the entireties with non-filing spouse) | $0.00 (value of Debtor's survivorship interest in TBE property) |
| Miscellaneous Marital Personal Property (owned in tenancy by the entireties with non-filing spouse) | $0.00 (value of Debtor's survivorship interest in TBE property) |
| Miscellaneous Personal Property Owned by the Debtor (excluding surrender value of life insurance policies) | $15,500.00 |
| Retirement Accounts | $175,773.00 (fully exempt; *See* Debtor's Schedule C of Schedules) |
| Life Insurance Policies (other than the policy pledged to Pinnacle Bank as security for Pinnacle Bank's claims) | $25,000.00 |
| 50% Ownership Interest in Titan Gaming, LLC | $0.00 (pass through entity; all income realized by Reel Amusements, LLC) |
| 100% Ownership Interest in Reel Amusements, LLC | Unknown (Reel Amusements, LLC in a Chapter 11 case without a confirmed plan. Value of entity too speculative to estimate liquidation value of ownership interest). |
| Causes of Action | Unknown |
| **Total Current Assets** | $261,273.00 |

| | |
|---|---|
| Less secured creditor's recovery | $35,860.86[1] |
| Less Chapter 7 trustee fees and expenses | $5,971.13[2] |
| Less Chapter 11 administrative expenses | $30,000.00[3] |
| Less priority claims, excluding administrative expense claims | $0.00 |
| Less Debtor's claimed exemptions | $185,773.00 |
| Balance available to pay unsecured claims in a Chapter 7 liquidation | $3,668.01 |
| Total amount proposed to be paid to unsecured claims | $10,000.00 |

The Plan therefore satisfies the requirement to provide creditors with distributions that are not less than the amount such creditors would receive or retain if the Debtor's assets were liquidated under Chapter 7. The Debtor submits that confirmation of the Plan is in the best interest of creditors and should be approved.

## CONFIRMATION PROCEDURES

The Plan cannot be consummated unless it is confirmed by the Court. Confirmation of the Plan requires that, among other things, either (i) each Class of Claims or Interests that is impaired by the Plan has voted to accept the Plan by the requisite majority, or (ii) the Plan is determined by the Court to be fair and equitable, as defined by the Bankruptcy Code, with respect to Classes of Claims or Interests that have rejected the Plan. The Bankruptcy Code also requires that the confirmation of the Plan be in the "best interests" of all holders of Claims and Interests. The Debtor believes that the Plan meets the Confirmation requirements of the Bankruptcy Code.

---

1 Liquidation Analysis omits secured creditor recovery on real estate owned in tenancy by the entireties, as the equity left following a liquidation and payoff of such secured creditors would be held in tenancy by the entireties with the Debtor's non-filing spouse, resulting in a value of $0.00 to the Debtor's unsecured creditors.

2 Based on estimated 8% commission to Chapter 7 Trustee.

**Creditors Eligible to Vote.** Only the votes of Classes whose Claims or Interests are impaired by the Plan will be counted in connection with the Confirmation of the Plan. Generally, and subject to the specific provisions of § 1124 of the Bankruptcy Code, a Class is "impaired" if its legal, equitable or contractual rights attaching to the Claims or Interests of that Class are modified by the Plan. In determining acceptance of the Plan, votes will be counted only if submitted by a holder of an Allowed Claim or Allowed Interest. Claims or Interests may be Allowed by the Court for voting purposes only. Classes 1 and 11 of the Plan include Claims or Interests that are not impaired under the Plan. All other Classes of Claims or Interests are impaired.

**Acceptance Necessary to Confirm the Plan.** For the Plan to be accepted and thereafter confirmed, it must be accepted by at least one Class of Claims which is impaired by the Plan. Under § 1126 of the Code, the impaired Class is deemed to have accepted the Plan if: (i) with respect to a Class of Claims, votes representing at least two-thirds (2/3) in amount and more than one-half (1/2) in number of Allowed Claims that have voted in that Class have accepted the Plan, and (ii) with respect to a Class of Interests, votes representing at least two-thirds (2/3) in amount of those Allowed Interests that have voted have accepted the Plan; provided that the vote of any holder of an Allowed Claim or Allowed Interest whose acceptance or rejection of the Plan was not made in good faith, as determined by the Court, will not be counted.

If a Class of Claims has been impaired by the Plan, the impaired Class must accept the Plan. Otherwise, the Court, in order to confirm the Plan, must independently determine that the Plan provides to each holder of a Claim or Interest, as the case may be, of such Class a recovery which has a value, as of the Effective Date, at least equal to the value of the distribution which such holder

---

3 Estimated unpaid attorney's fees incurred by the Debtor's estate during this case.

would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

**Manner of Voting.** In voting for or against the Plan, please use only the ballot sent to you with this Disclosure Statement. If a creditor has an Allowed Claim or Allowed Interest in more than one Class, such creditor may vote multiple ballots. Holders of Allowed Claims or Allowed Interests entitled to vote to accept or reject the Plan may vote by completing, dating, signing and transmitting the ballot to: Dunham Hildebrand, PLLC, 1704 Charlotte Avenue, Suite 105, Nashville, Tennessee 37203, Email: ned@dhnashville.com.

To be counted, a ballot must be received at the above address on or before the date and time set forth in the ballot. A ballot, once submitted, cannot be withdrawn or modified except as provided under the Bankruptcy Code.

**Confirmation Without Unanimous Acceptance.** Section 1129(b) of the Bankruptcy Code provides that the Plan may be confirmed by the Court despite not being accepted by every impaired Class if: (i) at least one impaired Class of Claims, excluding the Claims of insiders, has accepted the Plan; and (ii) the Court finds that the Plan does not discriminate unfairly and is fair and equitable to the rejected Classes. Among other things, such a finding would require a determination by the Court that the Plan provides that no holder of an Allowed Claim or Allowed Interest junior to the rejecting Class will receive or retain property or payment under the Plan until or unless such rejecting Class is paid in full.

The Debtor reserves the right pursuant to § 1129(b) of the Code to request the Court to confirm the Plan if all of the applicable requirements of § 1129(a) of the Code have been met. In addition, the Debtor reserves the right pursuant to § 1126(e) of the Code to request the Court to strike

32

any ballot rejecting the Plan cast by any holder of a Claim or Interest which was not cast in good faith.

**Hearing on Confirmation of the Plan.** The Court will set a hearing on Confirmation of the Plan to determine whether the Plan has been accepted by the requisite number of holders of Claims and Interests and whether the other standards for Confirmation of the Plan have been satisfied. The hearing may be adjourned from time to time without further written notice other than an announcement in open Court.

DATED: March 12, 2019        Respectfully Submitted,

**DAVID KEVIN SHARP**


/s/ David Kevin Sharp
DAVID KEVIN SHARP


/s/ Ned Hildebrand
Griffin S. Dunham
Henry E. ("Ned") Hildebrand, IV
DUNHAM HILDEBRAND, PLLC
1704 Charlotte Avenue, Suite 105
Nashville, TN 37203
615.933.5851
griffin@dhnashville.com
ned@dhnashville.com
*Attorneys for David Kevin Sharp*

33

**SUMMARY OF GUARANTEED AND NON-GUARANTEED UNSECURED CLAIMS NOT SEPARATELY CLASSIFIED**

| Class | Name | Insider | Status of Claim | Impaired | Allowed Claim |
|---|---|---|---|---|---|
| 10 | American Express National Bank | N | Non-Guaranteed | Y | $58.30 |
| 10 | Bank of America, N.A. | N | Non-Guaranteed | Y | $3,973.00 |
| 10 | Discover Bank | N | Non-Guaranteed | Y | $264.87 |
| 10 | Financial Pacific Leasing (f/k/a Alliance Funding Group) | N | Guaranteed | Y | $12,370.02 |
| 10 | BB&T Commercial Equipment Capital Corp. | N | Guaranteed | Y | $8,843.41 |
| 10 | Leaf Capital | N | Guaranteed | Y | $243,912.32 |
| 10 | CIT Bank, N.A. | N | Guaranteed | Y | $458,516.72 |
| | | | | | |
| | **Total Amount for Class** | | | | **$727,880.34** |

| Income | Debtor | Debtor's Non-Filing Spouse |
|---|---|---|
| **Gross Monthly Income** | $6,933.00 | $6,500.00 |
| **Less Payroll Deductions (see Schedule I)** | $928.24 | $1,380.47 |
| **Total Monthly Income** | $6,004.76 | $5,119.53 |
| | | |
| **Combined Total Monthly Income** | $11,124.29 | |

**Expenses (other than payment on secured debts; See Schedule J)**

| | | |
|---|---|---|
| Taxes on Primary Residence | $517.33 | |
| Homeowner's Insurance | $583.45 | |
| HOA Dues | $35.00 | |
| Electricity, Heat, and Natural Gas | $510.00 | |
| Water, Sewer, and Waste Disposal | $70.00 | |
| Telephone/Internet | $267.46 | |
| Food | $800.00 | |
| Clothing | $100.00 | |
| Personal Care Products | $40.00 | |
| Medical and Dental Expenses | $400.00 | |
| Transportation | $150.00 | |
| Entertainment | $250.00 | |
| Life Insurance | $842.50 | |
| Vehicle Insurance | $261.81 | |
| Taxes on Condominium | $250.00 | |
| Insurance on Condominium | $46.83 | Condominium expenses to end after sale of Condominium. |
| Electricity for Condominium | $120.00 | |
| Condominium HOA Dues | $745.22 | |
| **Total Estimated Expenses** | **$5,989.60** | |

| | | |
|---|---|---|
| **Net Household Income Before Plan Payments** | **$5,134.69** | |

**Less Plan Payments (Other than those to be paid on the Effective Date)**

| | | |
|---|---|---|
| Bank of America | $1,009.74 | |
| First Pinnacle Claim | $1,558.74 | |
| Fifth Third Bank | $1,507.74 | |
| U.S. Bank | $660.43 | |
| Mass Mutual | $928.24 | |
| Second Pinnacle Claim | $250.00 | |
| Unsecured Claims | $83.33 | |
| **Total Paid Under Plan** | **$5,998.22** | |

| | | |
|---|---|---|
| **Total Available After Expenses and Plan Payments** | **-$863.53** | |